**Linda Baumgart STEPHENSON, Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA, Defendant.**

No. EV 91–70–C.

United States District Court, S.D. Indiana, Evansville Division.

Jan. 3, 1995.

Order Amending Prejudgment Interest March 27, 1995.

Virginia M. O'Leary, Kelly A. Lonnberg, O'Leary & Associates, Oakland City, IN, for Linda Baumgart Stephenson.

David R. Sauvey, Kightlinger & Gray, Evansville, IN, for Aluminum Company of America, Bob Holmes, Bruce Keith, and Joe Riepenhoff.

Maria Greco Danaher, Leboeuf Lamb Greene & MacRae, Pittsburgh, PA, for Aluminum Company of America.

### MEMORANDUM

BROOKS, District Judge.

Plaintiff Linda Baumgart Stephenson was hired as a Security Officer in January, 1985, by Defendant Aluminum Company of America ("Alcoa") for its Warrick Operations, located in Newburgh, Indiana. Plaintiff was terminated by Defendant Alcoa on February 12, 1991.

Plaintiff brought an action in this Court alleging that she was subjected to sexual discrimination in the form of a hostile working environment and discriminatory transfer and discharge, seeking back pay, reinstatement, attorneys' fees and costs. Plaintiff further alleged that Alcoa intentionally interfered with her worker's compensation claim to retaliate against her for opposing Alcoa's discriminatory policies.

This matter was tried before the Court and jury commencing July 11, 1994. On August 8 the jury rendered its verdict for the Defendant on Plaintiff's claims under the Civil Rights Act of 1991 regarding failure to timely pay worker's compensation claims for foot surgery and state tort claims for intentional infliction of emotional distress. The Court took under advisement the Plaintiff's claims under the Civil Rights Act of 1964 (those accruing prior to November 21, 1991).

The Court, having considered the evidence, including all exhibits entered before the Court and the testimony of the witnesses, now enters its findings of fact and conclusions of law in this memorandum.

### I. BACKGROUND [1]

Plaintiff was hired as a security guard by Alcoa in 1985. In 1986 she was promoted to the position of Intern Unit Supervisor in Warrick's Anode Department. There she was supervised by Area Supervisor Tom Haines.

Plaintiff alleges various incidents of discrimination and intimidation while she worked in the Anode Department.[2] In May of 1988, Plaintiff applied for and received the position of Unit Supervisor in the Finishing Department. At first, Plaintiff was satisfied with the move. However, after a while, she began to experience further incidents.

Plaintiff and others testified to many incidents during Plaintiff's tenure in Finishing, including being subjected to sexually explicit magazines and cartoons (Ex. 38 A. Cassidy 3; Testimony of Plaintiff and Simmons); finding a letter derogatory of women left on a clipboard by a co-worker (Ex. 38 R. Mattingly 3; Testimony of Plaintiff, Simmons, Cassidy and Doty); sexual remarks and unwelcome advances directed at her by a co-worker (Testimony of Plaintiff); being followed around the plant site by a co-worker (Testimony of Plaintiff and Simmons); and inappropriate touching. (Testimony of Plaintiff.)

Plaintiff brought many of these incidents as they occurred to the attention of Bill Doty, the Finishing Department Supervisor. Doty testified that he investigated Plaintiff's complaints, but did not find or could not determine whether or not there was ever a violation of Alcoa's EEO policy. Doty testified that, because the stories of Plaintiff and the alleged harassers were in conflict, he could not resolve the issue of whether harassment had occurred.

A number of Plaintiff's allegations centered on the behavior of Ken White, the Unit Supervisor whose shift usually preceded hers. From 1988 through 1990 White exhibited a rude and hostile manner to Plaintiff

---

**1.** The section of this opinion labelled "Background" includes the Court's findings of fact required under Rule 52(a) of the Federal Rules of Civil Procedure, and the section labelled "Analysis" includes the Court's conclusions of law. Any finding of fact that is more appropriately characterized a conclusion of law and any con-

clusion of law that is more appropriately characterized a finding of fact is so deemed.

**2.** Because we find that Plaintiff can not recover for these incidents due to the statutory time limit, *See infra,* we will not discuss them at any length.

and other women, told Plaintiff that women who worked in industrial settings were "sluts and whores" and frequently complained about having to work with women. (Testimony of Plaintiff, Simmons.) Plaintiff also testified that White refused to provide her with proper information at shift change.

Deb Simmons,[3] a female Relief Unit Supervisor in Finishing at the time Plaintiff worked there, also testified to White's behavior toward Plaintiff and his comments regarding women in the workplace. Simmons testified that White told her that he had a problem working with women and that women were only good for road construction work if they could stop traffic with their "big tits." Simmons also observed White behaving in a rude manner toward Plaintiff. Kathy Luff, the Unit Supervisor who replaced Plaintiff, testified that she also was told by White that he did not believe women should work in the position she was in.

White testified that he never told Plaintiff, or other female Alcoa employees that they she should not be working at Alcoa. White did admit that he did not think women should work in industrial settings, and admitted to telling a story about a female construction worker who was so "attractive" she could stop traffic, but denied that he had a problem working with women in the Unit Supervisor position.

The Court finds Plaintiff's testimony to be more credible than that of White. We note that Plaintiff's testimony that White expressed his views regarding women in the workplace to her was thoroughly corroborated by other witnesses, and White himself did not deny holding those views. We find that White's views were generally known in the Finishing Department, which they could not have been if he had not expressed them. We further find, based upon White's demeanor on the stand, that his story regarding a woman who was "attractive" enough to stop traffic was told at Alcoa in the more colorful language testified to by Simmons, rather than the tame version White offered the Court.

Plaintiff attempted to deal with harassment from White by confronting him directly. When this failed, she brought it to the attention of Shift Supervisors Bob Holmes and Alan Cassidy, and her Department Supervisor, Bill Doty. (Testimony of Plaintiff.)

Doty testified that he believed Plaintiff's concerns regarding White were legitimate. Doty also testified that if White had actually withheld shift change information from Plaintiff because she was a woman, it was a violation of Alcoa's EEO policy. Doty, however, determined that White did not withhold or give incorrect information to Plaintiff because she was a woman. Testimony from other witnesses regarding the transfer of information at shift change indicated that such information was often incomplete or incorrect, through no fault of the Unit Supervisor. White himself testified that he did not withhold or give incorrect information to Plaintiff. The Court finds as fact that Plaintiff has failed to demonstrate at trial that White purposely withheld or gave incorrect information to Plaintiff in order to discriminate against her.

Doty confronted White regarding Plaintiff's complaints, and White told him that he believed there were certain jobs that women shouldn't do at Alcoa.[4] (Testimony of Doty, Ex. K.) White also told Doty that he could work with women. Doty testified that he was unable to determine whether White violated Alcoa EEO policy through his behavior toward Plaintiff, but Doty did determine that White did not improperly withhold information from Plaintiff.

Doty then requested Alan Cassidy and another Shift Supervisor, Joe Riepenhoff, to further investigate Plaintiff's complaints. Cassidy testified that he did not see any discrepancies in the information White provided Plaintiff at shift change, although he did not recall Plaintiff's other complaints regarding White. Cassidy and Riepenhoff told Doty there was no evidence that White was discriminating against Plaintiff. (Testimony of Doty.) Doty informed Plaintiff of this.

---

**3.** At the time she worked in Finishing, Simmons used her married name of Krochta. She has since returned to using her maiden name.

**4.** White denies telling Doty this.

Doty then asked for a meeting at the end of July, 1989 between White, Cassidy, Riepenhoff, Holmes and Plaintiff. (Testimony of Doty.)

The meeting took place near midnight in the Finishing Unit Shift Supervisor's office. Notes were taken by Plaintiff, Riepenhoff, Holmes and Cassidy. (Ex. 38 B. Keith 18; Ex. 38 W. Doty 20.) Plaintiff testified the meeting was arranged with her sitting in the center of the room facing White and Riepenhoff, with Holmes and Cassidy directly behind her. Two issues were discussed: White's "people skills" and White's attitude toward women. (Ex. 38 W. Doty 20.) White admitted at the meeting that he was "not a patient person," but denied he had a problem working with women. Plaintiff insisted he did, and the meeting reached an impasse. (Ex. 38 B. Keith 18; Ex. 38 W. Doty 20.)

Plaintiff testified that throughout the meeting, White was rubbing a pen-knife along the seam of his jeans and sole of his work shoes. Holmes, Cassidy and White could not recall the presence of the knife, although none was certain there was no knife. White testified that he did carry a pen knife, but did not recall taking it out during the meeting. After the meeting, Plaintiff was so upset she felt ill and had to leave work. (Testimony of Plaintiff.)

Some time after the meeting, Plaintiff met with Doty. Doty indicated that he considered the actions he had taken in regard to Plaintiff's complaints to be supportive. (Ex. 38 W. Doty 21.) Plaintiff reiterated that White's attitude toward women was affecting her ability to work by causing her stress. (Ex. 38 W. Doty 21; Testimony of Plaintiff, Doty.)

White testified that he was never disciplined, either formally or informally for his actions toward Plaintiff. White also testified that he never altered his attitudes toward women working at Alcoa, because he "never had a bad attitude." White's evaluation, filled out in December 1989 by Bob Holmes, noted that White needed to address his attitude about females in the work place, although he was rated as "good" in EEO accountability. (Ex. 18a.)

Alcoa, through Keith and Doty, took actions intended to remedy discriminatory behavior at Warrick, including sensitivity training and "team building" meetings. In addition, Defendant contracted with a consulting firm, Pope & Associates to conduct sensitivity training and deal with discrimination. Many of these measures were instituted throughout the Warrick plant, and not as a direct response to Plaintiff's complaints. (Testimony of Keith.) Plaintiff met with Eric Pennebaker, an employee with Pope & Associates, to discuss problems in the Finishing Department. These meetings were discontinued by Pennebaker, however, because he believed Plaintiff had violated a confidentiality agreement. (Testimony of Doty.) Plaintiff and Simmons also brought these issues to the attention of Tom Dawson, a member of the Warrick Minority/Female Awareness Committee. (Testimony of Plaintiff, Doty, Keith and Simmons.) Keith, through reports of Doty and Dawson, and also through direct contacts with Plaintiff, was also aware of Plaintiff's allegations regarding the Finishing Department. (Testimony of Keith, Doty and Plaintiff.) Both Doty and Keith told Plaintiff that it was appropriate for her to bring her concerns about discrimination to their attention. (Testimony of Doty and Keith.)

In the Spring of 1989, Plaintiff was accosted in the parking lot of the Warrick plant by Haines, who told her that she would not have been transferred unless he had approved it. Haines also told her that he had said he would get rid of her, and he had. (Testimony of Plaintiff.)

In November of 1989 Plaintiff became concerned that a scheduled "team building" meeting would be used to harass her. Plaintiff's fears were in part based upon her experience at the July meeting with White, Riepenhoff, Holmes and Cassidy. (Testimony of Plaintiff.) Plaintiff's attorney and psychologist wrote letters on Plaintiff's behalf, requesting she be excused from attending the meeting. (Exs. N, BB.) Plaintiff was told to attend the meeting or submit to an evaluation by Dr. John F. Ireland, a clinical psychologist. (Testimony of Plaintiff, Keith.) Plaintiff chose to be evaluated by Ireland and

did not attend the team building meeting. (Testimony of Plaintiff.)

On January 2, 1990, Plaintiff filed a charge of sex discrimination concurrently with the Indiana Human Rights Commission ("IHRC") and the EEOC.

On February 26, 1990 Plaintiff was summoned to Bruce Keith's office. Keith told Plaintiff that the situation in Finishing had reached "an unplayable lie" and that Plaintiff and Simmons would both be transferred to a new department.[5] (Testimony of Plaintiff.) Keith told Plaintiff that both she and the Finishing Department bore responsibility for the difficulties she experienced there, and thus she had some "ownership" of the problems. Keith told her she would have a "clean slate" and would be judged on her performance in the Planning Department. (Testimony of Plaintiff.) Keith later reiterated these statements at a meeting with Plaintiff on April 6, 1990. Keith told Plaintiff that by "ownership" he meant that Plaintiff "didn't always act in a way that minimized problems" and "wouldn't let them die." He also told her that at times she would create an issue where none existed. (Ex. 8.)

The Court finds that neither Doty nor Cassidy, nor anyone else in Finishing requested that Plaintiff be transferred from the Finishing Department. (Testimony of Doty, Cassidy.) Doty and Cassidy both testified that Plaintiff acted properly in bringing forward her complaints regarding sexual harassment in Finishing. Plaintiff always acted professionally while at work. (Testimony of Cassidy.) In fact, Plaintiff received an overall audit of 4 ("good") in 1989. (Ex. G.) A second evaluation, never completed, was prepared by Cassidy and rated Plaintiff again as a 4 audit, with "outstanding" ratings in safety and problem solving. (Testimony of Cassidy; Ex. H.) While in Finishing, Plaintiff expressed an interest in becoming a Shift Supervisor. (Ex. G.) Cassidy testified that he believed this to be a reasonable goal. (Testimony of Cassidy.)

Plaintiff was transferred to the Planning Department. Plaintiff's position was to be titled "Planning and Scheduling Model Administrator."[6] Plaintiff's base pay was increased by a grade; however, she was no longer eligible to receive overtime pay. In fact, Plaintiff was able to earn substantially less in her new position. (Testimony of Plaintiff; Ex. 36.)

Once in the Planning Department, Plaintiff was told by Keith not to talk about her past experiences in Finishing or about the transfer. (Testimony of Plaintiff.) Plaintiff's audit was also reduced to a 3 ("fair"). (Testimony of Plaintiff, Ex. 38 Elsea 2.) Plaintiff's new position was not fully defined and for a period after the transfer Plaintiff was allotted few responsibilities and was not even assigned an office. (Testimony of Plaintiff.)

David Rice, Planning Services Supervisor, testified that he believed Plaintiff had expressed an interest in the position in Planning before she was placed in it. Jan Elsea, then-Department head of Customer Services, testified that he had asked Keith to transfer Plaintiff to Planning because he was aware of her background and had heard she was available. Elsea specifically testified that Keith did not ask him to take Plaintiff into his department, but rather that he asked for her to be transferred.[7] Plaintiff did not apply

---

**5.** The Court, *sua sponte,* takes judicial notice pursuant to Fed.R.Evid. 201(b) and (c) that the golf term "unplayable lie" refers to a situation in which a badly hit ball lands in a place where, because of the terrain, it is impossible to hit it out again. Although the Court has never been so unfortunate as to personally experience the situation, we are nonetheless familiar with the term.

**6.** Plaintiff testified that she was told she would be taking over the position of Planning and Scheduling Model *Coordinator* previously held by Mick Broshears. Jan Elsea testified that she was told her position would be that of Administrator at the time of the transfer. Elsea's notes indicate that Plaintiff was given an old job description of

her new position and that a new job description was being prepared. The only "old" job description for a position similar to Plaintiff's was that of Mick Broshears. (*cf.* Ex. 38 Rice Ex. 1 and 38 Rice Ex. 2.) In light of the confusion among Planning Department managers as to the why and how of Plaintiff's transfer, it is not surprising that there was a misunderstanding as to Plaintiff's job title.

**7.** This Court finds much of Elsea's testimony to be dubious based upon his demeanor in the courtroom and contradictions in his testimony. Elsea's own notes indicate he was not aware of Plaintiff's background before she came to Planning. (Ex. 38 Elsea 2.) Elsea's stated reasons

nor did she interview for this position with either her new supervisor David Farrell or Rice. (Testimony of Plaintiff, Keith, Farrell.)

Plaintiff's new position required both mainframe and personal computer proficiency. (Ex. 38 Rice Ex. 1.) Plaintiff had some personal computer experience, and had used Alcoa's plant computer to get reports she needed as a Finishing supervisor, but when transferred she did not have the skills needed to perform her new job. (Testimony of Plaintiff.) Plaintiff received very little, if any, formal training. (Testimony of Farrell; Ex. 38 Farrell 11.)

The informal training Plaintiff was expected to complete consisted largely of asking co-workers for help. (Testimony of Farrell.) Because of a work-related injury, Plaintiff was not at work for six weeks while in Planning, further impeding her ability to learn her job. (Testimony of Plaintiff, Farrell; Ex. 38 Farrell 11.) Later, Farrell instructed Plaintiff's co-workers not to help her anymore. (Testimony of Farrell.) Not surprisingly, Plaintiff had difficulty completing projects on time and made many errors. (Testimony of Farrell.) Nevertheless, by the end of 1990, Plaintiff was improving her performance. (Testimony of Farrell.)

On May 8, 1990, Keith, Elsea, Rice, Farrell and Bill McAdams, head of Alcoa's Employee Assistance Program, met to discuss Plaintiff. Keith and Rice both testified that the meeting was to discuss Plaintiff's "performance." Keith's notes, however, reflect nothing of Plaintiff's performance, but rather deal with her harassment claims.[8] At that meeting, Keith instructed Farrell and Rice to limit Plaintiff's contacts outside the Planning department. Keith also told them to report to him if Plaintiff talked to anyone regarding her experiences in Anode and Finishing or if Plaintiff discussed "mistreatment" or showed an "obsession" with other people's view of her sexually. (Ex. 8.)

On August 13, 1990, Plaintiff filed a charge of sex discrimination and retaliation with the EEOC and IHRC regarding her transfer.

In January and February, 1991, Plaintiff and Farrell discussed goals and objectives for Plaintiff in the coming year. At that time, Plaintiff was promised she would be given training she had not yet received within the next six months. (Testimony of Plaintiff, Farrell; Ex. 38 Farrell 16.)

On February 12 of 1991, Farrell was informed that Plaintiff was to be terminated that day. This was his first notice of the firing. (Testimony of Farrell.) Plaintiff was told that afternoon to be in Keith's office in fifteen minutes for a meeting with Keith and Farrell. (Testimony of Plaintiff.) At the meeting, Plaintiff was told she was being terminated due to problems with her performance in Finishing and planning. When Plaintiff asked for specifics, Keith told her there was no need to re-hash the problems. (Testimony of Plaintiff, Farrell.) Plaintiff was escorted from the building by Keith.

The decision to fire Plaintiff was made by Keith, and ratified by Ray Keller, Head of Warrick Operations.[9] Keller died before the termination was carried out. Subsequently Keith asked for and received approval for the termination from George Bergeron, Alcoa's Vice-President for Rigid Packaging. Bergeron testified that he relied on the advice of Keith and Alcoa legal counsel.

Plaintiff's immediate supervisor, David Farrell did not recommend or request that Plaintiff be fired. (Testimony of Farrell.) Rice testified that Plaintiff was fired for per-

---

for Plaintiff's firing were contradicted by Keith. His testimony regarding Plaintiff's "lack of energy and enthusiasm" was thoroughly contradicted by Plaintiff's co-workers. It was clear from Elsea's testimony that he had little day-to-day contact with Plaintiff. In sum, the Court finds that Elsea was not credible.

8. The Court is also puzzled as to why a staff psychologist would be present if Plaintiff's work performance was the only subject being discussed.

9. Keith testified that Keller fired Plaintiff. From the testimony of Keith and others, however, the Court infers that the decision to fire Plaintiff was made by Keith, after consultation with Elsea and David Rice. Elsea testified that he alone had fired Plaintiff, an assertion contradicted by Keith. What is undisputed is that Plaintiff's immediate supervisor, David Farrell, had no role in Plaintiff's firing, except as a witness.

formance problems in planning and attendance problems, although he was unaware that Plaintiff's absences were due to an on-the-job injury. Rice also testified that Plaintiff failed to apply herself to the position and lacked a willingness to confront problems. (Testimony of Rice.) Elsea testified that Plaintiff was fired for problems in Planning, and that there was no "holdover" of problems in Finishing. He also testified that Plaintiff had a low energy level and was unenthusiastic. (Testimony of Elsea.) Keith testified that Plaintiff was fired due to both her performance in Planning and due to performance "issues" in Finishing. (Testimony of Keith.) Keith was unable to be very specific about what these performance issues in Finishing were when called to testify by the Plaintiff, but when later called by Defendant he recited a laundry list of complaints, most of which were related to alleged deficiencies in Plaintiff's reporting of harassment in the Finishing Department. (Testimony of Keith.)

No one who worked with Plaintiff on a day-to-day basis in Planning found Plaintiff to lack energy or enthusiasm; in fact, the opposite was true. (Testimony of Booker–DeMar, Wright, Marksbury.) Nor did Plaintiff's co-workers notice any attendance problem. (Testimony of Booker–DeMar, Marksbury.) No one ever told Plaintiff her performance was endangering her job. (Testimony of Plaintiff, Farrell, Rice, Elsea, Keith.) No one ever told Plaintiff her complaints regarding harassment and discrimination were not valid; on the contrary, Alcoa managers encouraged her to come forward with her concerns. (Testimony of Plaintiff, Doty, Cassidy, Keith.)

## II. ANALYSIS

### A. Acts Which Occurred Outside the Statutory Period

■ As a preliminary matter, the Court must determine what acts may properly be used by Plaintiff to show discrimination. Defendant argues that Plaintiff may not assert claims based upon acts which occurred in 1986 and 1987, as they occurred more than 300 days prior to the filing of Plaintiff first EEOC charge, that is, before March 8, 1989.[10] Nevertheless, Plaintiff may recover for these acts if she can show these acts were part of a "continuing violation."

■ To show a continuing violation, Plaintiff must demonstrate that the alleged acts of discrimination are part of an ongoing pattern of discrimination, and that at least one of the discrete acts alleged occurred within the relevant limitations period. *Young v. Will County Dept. of Public Aid,* 882 F.2d 290, 292 (7th Cir.1989).

In this case, Plaintiff testified that after her transfer to the Finishing Department, there was a period in which she was not harassed. Plaintiff also testified that in 1989 Haines accosted her in the parking lot of the Warrick plant and told her that she would not have been transferred unless he had approved it, and that he had said he would get rid of her, and he did. Plaintiff has presented no evidence, however, that Haines did or had the power to affect her working conditions, or that the incident itself affected her working conditions. The parking lot incident, no matter how boorish, was not discrimination as prescribed by Title VII.

All of Haines' acts, with the exception of the parking lot incident, took place before Plaintiff was transferred to Finishing at her request, and Plaintiff testified that the transfer effectively ended the harassment she had suffered in Anode. The Court therefore cannot find that there was any incident in the Anode department that was part of a continuing violation and which occurred after March 8, 1989. Plaintiff may not recover for those acts.

■ The Court previously addressed this issue in its order of February 9, 1994 addressing the cross-motions for partial summary judgment of Plaintiff and Defendant. In ruling on that motion, the Court found that a genuine issue of material fact existed with respect to this issue which could not be resolved at the summary judgment stage.

10. Plaintiff filed EEOC Charge No. 240900239 jointly with the EEOC and the IHRC on January 2, 1990. This is the earliest charge which forms the basis of her complaint. The limitations period extends 300 days prior to the filing of Plaintiff's charge, from March 8, 1989.

We resolve this issue now, at least with respect to the incidents in the Anode Department, in favor of the Defendant. We find *infra* that Plaintiff has shown by a preponderance of the evidence that she was subjected to a hostile work environment in Finishing. Such a claim usually involves a continuing violation, and that is so in this case. *See Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 532 n. 11 (7th Cir.1993) (citing *Purrington v. University of Utah*, 996 F.2d 1025 (10th Cir.1993)); *see also Vance v. Southern Bell Tel. And Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir.1989) ("A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits."). Therefore, Plaintiff may recover for those acts in Finishing which were part of her hostile environment claim and which occurred prior to March 8, 1989.

**B. Civil Rights Claims**

Title VII of the Civil Rights Act of 1964 provides:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin ...

42 U.S.C. § 2000e—2(a).

> Title VII further provides
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e—3(a).

Plaintiff claims that Alcoa violated Title VII by subjecting her to a hostile working environment and by retaliating against her for opposing discrimination. We shall discuss each of these claims in turn.

**1. Hostile Work Environment**

██ In order to establish a claim for hostile work environment, Plaintiff must show first, that she was, because of her sex, subjected to such hostile, intimidating or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked; and second, that Defendant's response or lack of a response to the behavior was negligent. *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994). The behavior must be severe or pervasive enough to create an objectively hostile or abusive work environment, one that a reasonable person would find abusive. Likewise, the conduct must be subjectively abusive; that is, the victim must perceive it to alter the terms and conditions of employment. *Harris v. Forklift Systems*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

██ Defendant argues that the conduct Plaintiff complained of did not rise to the level of harassment, and that the work environment was neither objectively nor subjectively hostile. Defendant further argues that it responded adequately to Plaintiff's complaints.

██ In determining whether an environment is "hostile" or "abusive," this Court must look at all the circumstances. Factors relevant to this consideration "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, at ——, 114 S.Ct. at 371.

Plaintiff has presented evidence of a number of incidents extending back to her employment in the Anode department at Alcoa. The most degrading and abusive incidents took place while Plaintiff was in the Anode department, many of them inflicted upon her by her supervisor, Tom Haines. As noted previously, however, these incidents occurred outside the statutory period for Plaintiff's claims. Plaintiff has, however, presented ev-

idence of a number of incidents of discrimination based upon her gender which fall within the statutory period.

Specifically, Plaintiff testified that she was subjected to sexually explicit magazines and cartoons, a letter derogatory of women was left on a clipboard by a co-worker, a co-worker made sexual remarks and unwelcome advances to her, and she was stalked around the plant site by another co-worker. In addition, Plaintiff was subjected on a nearly daily basis to the comments and attitude of Ken White, whose shift regularly preceded hers. White's attitude toward her and other women was well known, and the Court has found that White expressed these attitudes freely. These comments and White's behavior toward Plaintiff culminated in the July 1989 meeting between Plaintiff and White. Plaintiff left work because of the effects of that meeting, and at a later date, Plaintiff met with Doty and reiterated that White's attitude continued to cause her stress.

Defendant calls Plaintiff's experiences "instances of inappropriate behavior" and, citing Seventh Circuit precedent, argues that " 'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim." *Saxton*, 10 F.3d at 533.[11] There is no "magic number" of incidents that must take place to give rise to a cause of action under Title VII. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). The determination of the existence of a hostile environment must be made by evaluating all the circumstances. *Harris*, 510 U.S. at ——, 114 S.Ct. at 371. In order to find that Plaintiff's experiences were isolated instances of misconduct, the Court would have to focus on each separate act and ignore the totality of Plaintiff's circumstances, which would be contrary to the framework set forth in *Harris*. This argument of Defendant must therefore fail.

The Court also rejects Defendant's argument that the incidents Plaintiff described were not gender based discrimination but instead merely "personality conflicts." It can not be seriously maintained that the cartoons and letter left in the workplace, the sexual advances of co-workers, and Ken White's comments regarding women in the workplace, were not gender based.

Nor may Defendant prevail on its argument that the conduct was not objectively or subjectively hostile. The pervasive nature of the incidents and especially the recurring discrimination by Ken White were sufficiently severe that a reasonable person would have found the work environment hostile and abusive.

Defendant's argument that the department was not objectively hostile is based on the testimony of Deb Simmons and Kathy Luff, two other women who worked in the Finishing department. Defendant claims these women testified that they did not perceive the atmosphere in Finishing to be hostile and abusive, and that this requires this Court to find that a reasonable person would not have found it so.

Defendant's characterization of Simmons' testimony is disingenuous. Simmons testified that she made many complaints to Alcoa management about incidents of sexual harassment. Although she may not have used the magic words of the law while on the stand, she is not required to do so. Her testimony indicated that she found the atmosphere to be hostile. Her career after she was transferred has no relevance to the Finishing department at the time Plaintiff was there. Similarly, Luff replaced Plaintiff after her transfer, and thus did not have an opportunity to observe the Finishing department at the time Plaintiff was there.

---

**11.** Defendant cites *Saxton, Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333 (7th Cir.1993) and *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456 (7th Cir.1990). All of these cases are distinguishable from the present case. Contrary to Defendant's assertion, the court in *Dockter* did find that the work environment was "hostile," but that the plaintiff in that case did not show injury that could be remedied under Title VII. *Dockter*, 913 F.2d at 460. The plaintiff in *Weiss*, in contrast to the Plaintiff in this case, was merely subjected to the unwelcome sexual overtures of one co-worker on two isolated occasions. Finally, *Saxton* similarly involved the unwelcome sexual advances of one employee, and, unlike Defendant, upon notification the employer took prompt and appropriate action to prevent a recurrence of the harassment. *Saxton*, 10 F.3d at 535; *see infra*.

Defendant argues that because Plaintiff testified that she was able to maintain her work performance, she did not find the work atmosphere subjectively hostile or abusive. Defendant also argues that because Plaintiff admitted to psychological counseling for matters which arose before and were unrelated to her experiences at Alcoa, she has not shown that she was harmed. Defendant misconstrues Title VII as requiring only that discrimination not prevent a woman from doing her job or injure her psychological well-being. This is wrong. Title VII protects those with the dedication and fortitude to complete their assigned tasks even in the face of discrimination. *Doe,* 42 F.3d at 445. As stated in *Harris:*

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris,* 510 U.S. at ——— ———, 114 S.Ct. at 370–71.

Although the evidence showed Plaintiff was able to discharge her duties adequately, it is clear the discrimination she faced hampered her. She testified that she suffered frequent emotional upset and on at least one occasion had to leave work early. Plaintiff also testified that she often came to work early in order to prepare for her shift, because White would not cooperate at shift change. Plaintiff has shown that the work environment in the Finishing department was subjectively hostile and abusive.

### a. Negligent Response

■ Beyond showing that she was the victim of harassment, Plaintiff must also show that Defendant's response or lack of a response to the behavior was negligent in order to recover under Title VII. *Carr,* 32 F.3d at 1009. The Seventh Circuit has set out the rule governing employer liability for harassment under title VII as follows:

> It is not respondeat superior. It is a negligence standard that closely resembles the "fellow servant" rule, from the era when industrial accidents were governed by negligence rather than workers' compensation law. Under that rule, as under Title VII, the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action. The employer acts unreasonably either if it delays unduly or if the action it does take, however promptly, is not reasonably likely to prevent the misconduct from recurring.

*Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990) (citations omitted). The reasonableness of an action is a question of fact. *Guess,* 913 F.2d at 465.

Defendant, citing *Saxton,* argues that it took reasonable steps to eliminate the harassment. We disagree. In *Saxton,* the defendant began an investigation of the alleged harassment the day after it was advised of the complaint. A detailed report was completed two weeks later, and the offending employee was transferred out of the work environment within five weeks after the defendant learned that Saxton was not interested in transfer herself. *Saxton,* 10 F.3d at 535.

In contrast, Defendant's actions seemed intended only to placate Plaintiff and not to address her concerns. Little investigation was made beyond interviewing the alleged harassers for "their side of the story." Once this was done, there is no evidence that there was any further action to alleviate the problem, except to acknowledge that there was a disagreement as to what was said or done. Although Plaintiff met with a "facilitator" from Pope and Associates, allegedly to address her complaints, nothing was done beyond getting Plaintiff to sign a confidentiality agreement. No attempt was made to curtail

or punish the discriminatory comments made by Ken White. Defendant never made any determination that Plaintiff had actually been harassed. While it is true, as Defendant points out, there were many meetings between Alcoa managers and legal counsel regarding Plaintiff, Defendant has asserted its attorney-client privilege regarding these meetings, and the matters discussed are not in evidence before this Court.

Finally, Defendant, unlike the defendant in *Saxton*, decided to address Plaintiff's discrimination complaints by transferring her, rather than the harassers. Also unlike *Saxton*, Plaintiff was not given any choice in the matter, nor were alternatives such as transferring White or any other of the alleged harassers considered. A transfer of the victim of harassment can be an acceptable method of dealing with harassment, but:

> A remedial measure that makes the victim of sexual harassment worse off is ineffective per se. *A transfer that reduces the victim's wage or other remuneration, increases the disamenities of work, or impairs her prospects for promotion makes the victim worse off.* Therefore such a transfer is an inadequate discharge of the employer's duty of correction.

*Guess*, 913 F.2d at 465 (emphasis added).

Here, it is undisputed that Plaintiff was a capable worker in Finishing, that her goal of advancing to become a Shift Supervisor was reasonable and appropriate, and that her transfer denied her the opportunity to take overtime pay. It is also clear that the transfer effectively foreclosed her opportunities to advance and placed her in a position with which she was unfamiliar and for which she was neither adequately trained nor prepared. We therefore find the transfer as a remedial action was insufficient, and Plaintiff is entitled to recover her damages.

### 2. Retaliation

In analyzing Plaintiff's retaliation claim brought under 42 U.S.C. § 2000e–3(a), we follow the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[12] *See Jennings v. Tinley Park Community Consolidated School District*, 796 F.2d 962, 966–67 (7th Cir.1986) *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 502 (1987) ("*Jennings I*"); *Klein v. Trustees of Indiana University*, 766 F.2d 275, 280 (7th Cir.1985). In order to establish the prima facie case of retaliation under *McDonnell Douglas*, Plaintiff must show that she engaged in statutorily protected expression; that she suffered an adverse action by her employer; and that there was a causal link between the protected expression and the adverse action. *Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 195 (7th Cir. 1994); *Holland v. Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1313 (7th Cir. 1989). This causal link may be demonstrated through evidence of a telling temporal sequence, that is an adverse action "on the heels" of the protected activity. *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir.1994); *Holland*, 883 F.2d at 1314.

If Plaintiff makes a *prima facie* showing, the burden of producing a legitimate non-discriminatory reason for her firing shifts to the Defendant. Once the Defendant meets this burden, Plaintiff bears the burden of showing that the Defendant's reason is pretextual and that its actual reason was discriminatory. *Dey*, 28 F.3d at 1457 (citing *McDonnell Douglas* and *Burdine*).

12. Plaintiff urges this Court to adopt the analysis employed in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), because the reasons offered by Defendant for Plaintiff's transfer and discharge are direct evidence of discrimination. Under the *Price Waterhouse* framework, once a plaintiff has shown that gender was a motivating factor in an adverse employment decision, the defendant may avoid liability only by showing that the same decision would have been made even if the plaintiff's gender had not been taken into account. *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. at 1795. While Defendant's offered reasons are certainly unusual, as the discussion below will demonstrate they are not unique or per se impermissible. Therefore, although it is a close call, we choose to use the *McDonnell Douglas* framework. In any event, the end result would be the same.

### a. *Prima Facie* Case

Plaintiff argues that her transfer and firing were in retaliation for her opposition to the harassment she suffered in the Finishing department. Plaintiff points out that her transfer took place within sixty days of her filing of her first charge of discrimination with the EEOC; thus the two events are sufficiently close to each other in time that the Court infers a causal connection.

█ Defendant does not dispute that Plaintiff engaged in statutorily protected expression and has met the first criterion for her *prima facie* case.[13] Defendant argues, however, that the transfer was not an adverse employment action, and that, even if the Court were to find it so, there was no causal connection.

As discussed earlier in this memorandum, the transfer was an adverse employment action. Even a lateral transfer that does not result in a reduction of pay or benefits may be the basis for a claim of retaliation. *Collins v. Illinois*, 830 F.2d 692, 702–03 (7th Cir.1987). In this case, the transfer denied Plaintiff the opportunity to take overtime pay and also foreclosed her opportunities to advance. The Court finds that plaintiff has suffered an adverse employment action.

█ We therefore need only discuss Defendant's arguments against the causal connection. Defendant points out that Bruce Keith testified that the possibility of moving Plaintiff from the Finishing department was considered before plaintiff filed her charge. Thus, Defendant argues, the action could not be retaliatory.

Even were we to accept Keith's testimony, Defendant's argument must fail. Whether or not the action was contemplated prior to Plaintiff's complaint, the actual decision to transfer her was made after the complaint had been filed. Therefore, the sequence of events remains undisturbed: Plaintiff filed her complaint, Defendant transferred Plaintiff. This telling temporal sequence is enough to establish a *prima facie* case. Additionally, Bruce Keith's notes and testimony at trial indicate that Plaintiff's complaints of discrimination were a motivating factor in her transfer, further establishing Plaintiff's *prima facie* case.[14]

█ Turning now to Plaintiff's termination, that event took place over a year after the filing of her first charge, and six months after the filing of the second charge. Defendant argues that this period of time is sufficient to defeat the causal connection.

The Court has been unable to discover and Defendant has not directed us to any authority which places a six-month time limit on a causal connection. We are of the view, however, that it is not some arbitrary time period that determines whether there is a causal connection, but rather whether the Plaintiff has shown by a preponderance of the evidence that the adverse action was taken for retaliatory purposes. This evidence may take the form of a telling temporal sequence alone, where the rapidity and proximity in time to the protected expression itself serves as a causal connection. *Collins*, 830 F.2d at 705; *Holland*, 883 F.2d at 1315. It may also take the form of other facts. *See, e.g., Reeder–Baker v. Lincoln Nat'l Corp.*, 649 F.Supp. 647, 657 (N.D.Ind.1986), *aff'd*, 834 F.2d 1373 (7th Cir.1987) (memo placing employee on probation for threatening action against employer for alleged discrimination shows causal connection).

Here, it is not too far a stretch to find a causal connection between Plaintiff's August filing and her February firing. Plaintiff had

---

13. Plaintiff need not show that the practices she opposed actually violated Title VII, but only that she had a reasonable belief that they did. *Jennings I*, 796 F.2d at 966–67.

14. Defendant argues in a footnote to its trial brief that *Holland* only applies to a temporal sequence that is uncontroverted. Defendant then asserts that the sequence of events is "simply a matter of interpretation." We do not agree. *Holland* and the cases cited therein do not indicate that they are to be restricted in the manner Defendant suggests. Nor does Defendant's "interpretation" of events affect Plaintiff's *prima facie* showing. There is no dispute that Plaintiff filed her charge in January and was transferred in February. This is enough in this case to establish a *prima facie* case. Defendant's interpretation is in reality a proffer of a legitimate non-discriminatory reason for Plaintiff's transfer, the next step in the *McDonnell Douglas/Burdine* burden shifting framework.

already alleged one retaliatory action, and it is conceivable that Defendant would allow more time to pass before retaliating a second time. Further, Keith testified that Plaintiff's firing was due in the major part to performance problems in Finishing, performance problems which he had earlier described to Plaintiff as a failure to "minimize" problems and "let them die." These "problems" which Plaintiff failed to minimize or let die were the incidents arising from the hostile environment she was enduring. We therefore find that Plaintiff has shown a causal connection between her protected activity and the firing, and thus has adequately established a *prima facie* case of retaliation.

### b. Legitimate, Non-discriminatory Reason

■ Under the *McDonnell Douglas/Burdine* framework, the burden now shifts to the Defendant to articulate a legitimate, non-discriminatory reason for the adverse actions taken against Plaintiff. Defendant maintains that Plaintiff's performance in the Finishing and Planning departments led to her firing. Specifically, Defendant points to Plaintiff's "lack of cooperation" in dealing with her complaints of discrimination and her work performance in Planning.

The Defendant may not offer merely any reason for the discharge to meet its burden; rather, the proffered reason must be *legitimate. Jennings, I,* 796 F.2d at 967. Plaintiff urges this Court to find that Defendant's proffered reason is not legitimate, based as it is on Plaintiff's opposition to discrimination.

Defendant has certainly failed to present this Court with adequate argument or authorities explaining the circumstances under which an employee's opposition to discrimination may be legitimate grounds for an adverse action. We do not understand this failure, as Defendant is represented by highly competent counsel. Nevertheless, the Court is aware of the law in this area, and it would serve no purpose to ignore it. Therefore, we will examine Defendant's proffered reason in light of this law.

The question in a case such as this is whether the Plaintiff's conduct gave rise to a legitimate non-discriminatory reason for her transfer and subsequent discharge, despite

the fact that the substance of her protest was protected. The outcome depends upon whether in pursuing her protest against discrimination, Plaintiff exceeded the cloak of statutory protection by engaging in unreasonable conduct. *Jennings v. Tinley Park Community Consolidated School District,* 864 F.2d 1368, 1374 (7th Cir.1988) (*"Jennings II"*); *see also Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir.1976).

We do not find Plaintiff's actions to be unreasonable. Plaintiff pursued her complaints incrementally, first confronting the persons she believed harassed her, then proceeding up the chain of management, before finally filing charges with the EEOC. When Plaintiff was told not to discuss her problems in the Finishing department with her co-workers in Planning, she complied, asking only that she be allowed to speak to her immediate supervisor about them. No co-worker testified that Plaintiff was disruptive in the workplace or unprofessional in the way she dealt with her complaints. Most significantly, no one ever told Plaintiff her complaints regarding harassment and discrimination were not valid; on the contrary, Alcoa managers encouraged her to come forward with her concerns. Plaintiff may have been difficult to satisfy, however, she did not exceed the cloak of statutory protection. *See Jennings II,* 864 F.2d at 1374. Therefore, Defendant may not claim this as a legitimate non-discriminatory reason for her transfer and discharge. Because Defendant has failed to show a legitimate, non-discriminatory reason for Plaintiff's transfer, Plaintiff is entitled to recover damages resulting from that action.

■ Turning to Plaintiff's poor work performance in Planning, we find that this does meet Defendant's burden of production. Plaintiff's supervisor David Farrell testified that Plaintiff made mistakes during the preparation of reports and took too long to prepare them. Farrell also testified that Plaintiff lacked the knowledge and skills necessary to perform her duties well. We find that Defendant has articulated a legitimate,

non-discriminatory reason for Plaintiff's discharge in this respect only.

### c. Pretext

 Once the defendant meets the burden of showing a legitimate, non-discriminatory reason for an adverse action, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the defendant's reason is pretextual and the actual reason was discriminatory. *Dey,* 28 F.3d at 1457, (citing *McDonnell Douglas* and *Burdine*). Nevertheless, if the plaintiff successfully demonstrates that the proffered reason is a pretext, she is not entitled to judgment as a matter of law. The finder-of-fact may find in favor of the plaintiff, but is not required to. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1123–24 (7th Cir.1994). The ultimate burden of persuading the finder-of-fact that plaintiff was the target of discrimination remains at all times with the plaintiff. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747.

 In this case, Plaintiff has amply demonstrated not only that Defendant's proffered legitimate, non-discriminatory reason is a pretext, but also that she was the target of discrimination. Bruce Keith, Jan Elsea and David Rice, the Alcoa managers who took part in the decision to fire plaintiff, could not agree on why plaintiff was fired. Plaintiff's immediate supervisor, Dave Farrell, never requested that Plaintiff be fired. Farrell testified that Plaintiff's performance in Planning was actually improving at the time she was fired, and he and Plaintiff prepared a list of goals and expectations for the coming year just prior to her termination. Plaintiff was never warned that her job was in jeopardy due to her performance.

Plaintiff's coworkers testified that she was capable and did not lack enthusiasm or ener-

gy, the reason for Plaintiff's firing according to Elsea. Nor did her coworkers note any attendance problem, the reason for Plaintiff's firing according to Rice. Rice himself testified that he was unaware that Plaintiff's absences were related to an on the job accident and that they would, for that reason, not have been a grounds for firing her.

Finally, we have seen that the reason offered by Keith for Plaintiff's firing, lack of cooperation in dealing with discrimination issues, is not sufficient. The Court finds that Plaintiff's actions were protected opposition to discrimination, and that protected opposition was not *a* reason for her discharge, but rather that it was *the* reason. Plaintiff's difficulties with her position in Planning, difficulties which stemmed from the discriminatory transfer and lack of preparation or training, were simply a cover for retaliation. Plaintiff is entitled to recover her damages due to the firing.[15]

### C. Damages

 Once plaintiff has established that she was the victim of unlawful discrimination on the part of the defendant, a presumption in favor of full relief arises. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). We find that Plaintiff is entitled to the difference between her earnings as a supervisor in Finishing and her actual earnings from the date of her transfer to the present.[16] Bruce Keith has testified that Plaintiff would have been laid off if she had not been fired due to downsizing at the Warrick plant. We reject this testimony as totally self-serving and not credible. Plaintiff's position in Finishing has not been eliminated, and there is no credible evidence that she would not still hold that position absent Defendant's discrimination and retaliation.

---

15. We note that Plaintiff's damages are solely the result of her transfer and firing. Thus, because the Court has determined that Plaintiff engaged in statutorily protected speech, even were we to find that there was no hostile environment claim, Plaintiff's damages would be the same.

16. Although Plaintiff was injured and received worker's compensation for much of the period since her termination, Alcoa's benefits package entitles workers to the difference between their full salary and worker's compensation. We therefore need not determine if Plaintiff would have been unable to work for part of the time due to her injuries.

No "unrealistic exactitude" is required of the calculation of Plaintiff's claim for back pay. *Horn v. Duke Homes,* 755 F.2d 599 (7th Cir.1985). Using Plaintiff's 1989 wages as a basis, we find that she is entitled to $145,507.64 through the end of 1994.[17] We further find that Plaintiff is also entitled to the value of her lost benefits (according to Bruce Keith's testimony, equal to 49 percent of her lost wages). This amount equals $71,298.74. Defendant is therefore **ORDERED** to pay Plaintiff $216,806.38 in lost wages and benefits.

■ Plaintiff requested and is presumptively entitled to prejudgment interest. *Loeffler v. Frank,* 486 U.S. 549, 557, 108 S.Ct. 1965, 1970, 100 L.Ed.2d 549 (1988); *Hutchison v. Amateur Electronic Supply, Inc.,* 42 F.3d 1037, 1047 (7th Cir.1994); *McKnight v. General Motors Corp.,* 973 F.2d 1366, 1372–73 (7th Cir.1992); *cert. denied,* 507 U.S. 915, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993) ("*McKnight II*"). Plaintiff has asked this Court to calculate the interest as compounded quarterly based upon the adjusted prime rate as established by the Internal Revenue Service.

■ The proper rate, however, is the average prime market rate that prevailed during the pendency of the litigation. *Partington v. Broyhill Furniture Industries, Inc.,* 999 F.2d 269, 274 (7th Cir.1993); *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1332 (7th Cir.1992). This rate is calculated from "the rate banks charge for short-term unsecured loans to creditworthy customers." *Id.* The Court therefore **ORDERS** the parties to determine the proper rate based upon the average market prime rate for each year of the pendency of this litigation.

■ This leaves the question of the manner of computing the interest due. Although this Court has at best very limited discretion in whether to grant prejudgment interest, it is within our discretion to choose any reasonable method for calculating that interest. *Hutchison,* 42 F.3d at 1047. In this case, the best method in the judgment of the Court is to determine the pro-rata amount of the award at the end of each year from the date Plaintiff was transferred (March, 1990) and award interest compounded annually on the total award to that date at the applicable rate. Thus the pro-rata award for the year 1990 is $37,380.41, which represents the ten months of 1990 after the date of the discriminatory transfer. For the years 1991 through 1994, the pro-rata award is $44,856.49. The Court **ORDERS** the parties to determine prejudgment interest in accordance with this formula.

■ Plaintiff has also requested reinstatement. The intent of Title VII is to restore a plaintiff to the situation she would have been in had no discrimination occurred, therefore reinstatement is warranted absent exceptional circumstances demonstrating that the position is no longer available or where a continued reduction in forces occurs. *See Gaddy v. Abex Corp.,* 884 F.2d 312, 319 (7th Cir.1989). But reinstatement, although usually the preferred remedy, is not always required. *Hutchison,* 42 F.3d at 1046; *McKnight II,* 973 F.2d at 1370.

■ Reinstatement should not be granted "where the result would be undue friction and controversy." *Hutchison,* 42 F.3d at 1046; *McKnight v. General Motors Corp.,* 908 F.2d 104, 115 (7th Cir.1990) ("*McKnight I*"). Nevertheless, mere employer hostility developed during litigation cannot alone defeat reinstatement. *Hutchison,* 42 F.3d at 1046; *McKnight I,* 908 F.2d at 116.

■ Here Plaintiff's position still exists despite Alcoa's layoffs. Alcoa has shown no other exceptional circumstances militating against reinstatement. Unlike the closely held corporation employer in *Hutchison,* Alcoa is a huge international concern, employing thousands of persons; it is unlikely that friction between the parties will be of serious concern. Also unlike *Hutchison,* Plaintiff has never expressed any ambivalence regard-

---

17. The Court calculated this amount by multiplying Plaintiff's wages of $47,957 as shown on her W2 form for 1989 by ten months in 1990 and for the years 1991–94, and then subtracting Plaintiff's actual earnings and workman's compensation from that amount. *See* Ex. 36 and Amended Ex. 37. This amount does not reflect any increase for merit or otherwise, as we find that the evidence regarding such increases is too speculative.

ing her desire for reinstatement; to her, reinstatement is the point of this litigation. The Court therefore **ORDERS** Plaintiff's reinstatement, and Defendant is **ENJOINED** from any further acts of discrimination or retaliation against Plaintiff.

Plaintiff has asked this Court to award her attorneys' fees and costs. As Plaintiff is the prevailing party in this litigation, the Court **GRANTS** Plaintiff's request for attorneys' fees, and Plaintiff is directed to submit a petition for attorneys' fees to the Court within 30 days of this order. Defendant shall file any response within 15 days thereafter. Plaintiff's reply, if any, shall be due within ten days of Defendant's response.

Finally, this opinion would be less than candid if it did not make mention of several concerns that trouble the Court. Extensive deliberation has satisfied the Court that, while the evidence revealed a less than ideal or fault-free plaintiff, her actions and expressions do not and should not alter the ultimate legal conclusion that she was the victim of sex discrimination. Admittedly, in the opinion of the Court, at times she could have been more tolerant or understanding toward her male co-workers; at times she appeared overly sensitive to certain remarks or slights. Nevertheless, the totality of the conduct and atmosphere clearly demonstrates she was subjected to a workplace that violated federal discrimination laws.

The Court feels compelled to include these remarks because the Court is ordering reinstatement. It is the hope of the Court that the Plaintiff will return to work with a renewed desire to be an efficient, productive and cooperative worker; that the past will be put behind her, and the focus placed on her future at Alcoa.

Of course, it goes without saying that a similar admonition applies to the Defendant Alcoa, and its workers. No one benefits from a workplace atmosphere such as the Court found existed here. While perhaps not always malicious, the language, attitudes and conduct were such that sooner or later the courts would be called upon to assess the situation and render judgment. Such an atmosphere is unproductive, unnecessary, illegal and, as this litigation has shown, expensive.

**IT IS SO ORDERED.**

## ORDER ON PREJUDGMENT INTEREST

This matter is before the Court on the parties' submissions regarding the proper rate for prejudgment interest on Plaintiff's award of back pay. Plaintiff submitted her data for the calculation of interest February 15, 1995. Defendant filed its data on February 24. The Court, being duly advised, now **ORDERS** that Plaintiff be awarded prejudgment interest in the amount of $48,841.94. The Judgement entered in this action is hereby amended to reflect this amount.

Plaintiff argued that prejudgment interest should be awarded at the rate of 12.5 percent. Using the method for calculating the interest amount ordered by this Court in its decision of January 3, 1995, this would have amounted to $93,508.74. Plaintiff argued that this amount was particularly appropriate, as Plaintiff had borrowed funds at this rate to finance her lawsuit. (O'Leary Afd., ¶ 4.)

Plaintiff quoted *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1332 (7th Cir. 1992) for the proposition that the market rate is the proper rate because "[t]hat is what the victim must pay." As Defendant pointed out, however, the court later discussed the amount in interest the *defendant* would be required to pay. The court's reasoning was that the cost in interest of the risk factors inherent to the *defendant* are the best indicator of the cost to the plaintiff as an involuntary creditor of defendant. *Id.*

It appears to this Court, although it is not expressly stated in the *Amoco Cadiz* opinion, that the Court of Appeals was struggling with the issue of the proper rate in the absence of a showing of the actual cost in interest to the plaintiff. In a case where a plaintiff actually incurred cost as a result of interest on funds wrongfully withheld, to award an amount greater than that actual interest incurred would be to grant a windfall to the plaintiff; an amount less than that cost would be a windfall to the defendant. The

object of Title VII is not to provide plaintiffs with a windfall, but rather to restore them to the position they would have been in but for the wrongful acts of defendants. *See Zabkowicz v. West Bend Co., Div. Dart Industries,* 789 F.2d 540, 553 (7th Cir.1986).

This leaves this Court on the horns of a dilemma. Plaintiff has indicated she has incurred interest expenses due to this lawsuit; that she did borrow funds to finance the suit, and that she paid an interest rate of 12.5 percent on these funds. However, Plaintiff has not shown that she borrowed a sum equal to the award in this case, or that her actual interest incurred even approaches the $93,508.74 she now seeks. She does not provide the Court with any detailed information upon which to calculate her actual loss of use of her funds during the pendency of her suit.

In the absence of any such showing, the Court accepts the Defendant's figures for the interest rates. Defendant has submitted the average prime rate for each of the years in question and computed the interest based upon these figures. Thus, the rate is 10.00 percent for 1990, 8.46 percent for 1991, 6.25 percent for 1992, 6.00 percent for 1993 and 7.14 percent for 1994. The total, using the method this Court had previously ordered for the calculation of interest, comes to $48,-841.94. The Court **ORDERS** Defendant to pay Plaintiff this amount in pre-judgment interest.

In its submission, Defendant attempts to raise objections to the amount of Plaintiff's damage award and to the method this Court ordered the parties to use to calculate interest. To the extent that these arguments are intended to be construed as motions under Fed.R.Civ.P. 59 or 60, they are not properly brought and are **DENIED**.

**IS SO ORDERED.**