**ZELLER ELEVATOR COMPANY,**
**Appellant–Defendant,**

v.

**Debbie S. SLYGH and Pamela Sue**
**Perry, Appellees–Plaintiffs.**

No. 93A02–0303–EX–245.

Court of Appeals of Indiana.

Oct. 9, 2003.

Jonathan D. Weinzapfel, Arthur D. Rutkowski, Bowers & Harrison, LLP, Evansville, IN, Attorneys for Appellant.

Frederick S. Bremer, Indiana Civil Rights Commission, Indianapolis, IN, Attorney for Appellees.

## OPINION

SHARPNACK, Judge.

Zeller Elevator Company ("Company") appeals a decision of the Indiana Civil Rights Commission ("ICRC") in favor of Debbie S. Slygh and Pamela S. Perry. The Company raises three issues, which we restate as:

I. Whether the ICRC's order remanding to the administrative law judge with instructions to find that Slygh and Perry were unlawfully sexually harassed was contrary to the requirements of the Indiana Administrative Orders and Procedures Act, Ind.Code § 4–21.5–1–1 through 4–21.5–7–9; and

II. Whether inferences made by the ICRC in its findings were reasonable; and

III. Whether the ICRC's conclusion that Slygh and Perry suffered actionable sexual harassment is erroneous.

We affirm.

The relevant facts follow. The Company is a sole proprietorship owed by Michael Zeller ("Zeller") that is in the business of installing, servicing, and repairing elevators. The Company's office is located in the basement of Zeller's residence. Zeller's office, a secretary's office, a small kitchen, and Zeller's laundry room are located in the basement. Employees rarely visited the office except to collect their weekly paychecks. Vendors and customers rarely visited the office. If vendors or customers visited, they made appointments.

Slygh was employed by the Company as a secretary from early 1993 through August 12, 1994. Perry was employed by the

Company as a secretary from September 7, 1994 through November 23, 1994. During the time that Slygh and Perry were employed with the Company, they almost always worked either alone or with Zeller. Slygh and Perry filed a complaint with the Indiana Civil Rights Commission ("ICRC") alleging that they were subjected to sexual harassment by Zeller while employed at the Company and that they were forced to leave their employment as a result of the alleged sexual harassment.

A hearing was held before an administrative law judge ("ALJ") for the ICRC. The ALJ entered proposed findings of fact and conclusions thereon finding that "Zeller's conduct, while unprofessional, was not, from the objective perspective of a reasonable person, sufficiently pervasive to alter Perry's [or Slygh's] working conditions." Appellant's Appendix, Tab 1 at 5, 8. Thus, the ALJ proposed a conclusion that "[n]either Slygh nor Perry was subjected to unlawful sexual harassment; consequently, neither the termination of Slygh nor the termination of Perry was the result of unlawful sexual harassment." *Id.* at 8. The ALJ also proposed a conclusion that "[w]hile Zeller's conduct was not severe, it came close to being sufficiently pervasive to constitute unlawful sexual harassment. He would be well advised to be more circumspect in the workplace." *Id.* at 8.

Slygh and Perry filed an objection to the ALJ's proposed findings of fact and conclusions thereon with the ICRC. The ICRC considered Slygh's and Perry's objections and found that "[b]oth Perry and Slygh demonstrated unwelcome conduct of a sexual nature that was sufficiently severe and pervasive to alter their working conditions to such an extent that a reasonable person would, as Slygh and Perry did, feel compelled to resign." Appellant's Appendix, Tab 2 at 3. Thus, the ICRC entered an order remanding the case to the ALJ with instructions to "issue a new proposed decision finding that [Slygh and Perry] were unlawfully sexually harassed, that [Slygh and Perry] were constructively discharged, and proposing appropriate relief." *Id.*

On remand, the ALJ entered revised proposed findings of fact and conclusions thereon in favor of Slygh and Perry. The ICRC then adopted the ALJ's proposed order with the exception of correcting some mathematical errors in the award of damages. The ICRC's order provides as follows with respect to Slygh:

9. "A couple of times, every two weeks, maybe" ... Zeller would be semi-clad (lacking a shirt and maybe socks) and complete dressing in Slygh's presence. Slygh would either tell him to get dressed or turn so that she was facing the other way.

10. Zeller would fold his laundry, including his underwear, in Slygh's presence.

11. Zeller made a comment to Slygh about some article of her clothing that he'd like to cut the strings.

12. Zeller showed Slygh pictures of himself and a prior girlfriend skinny dipping which showed the naked buttocks of both.

13. From time to time, Zeller would call Slygh to his bedroom to see something on the only television in the house. (On all these occasions, Zeller was fully clothed.)

14. One morning, Zeller told Slygh that if she had arrived a few seconds earlier, she'd have caught him in his birthday suit.

15. Zeller told Slygh that he had an annual HIV test and that he thought that everybody should. This comment was apparently in response to Slygh's mentioning her

concern about having received a blood transfusion during surgery.

16. Zeller told Slygh that his bathtub was big enough for two.

17. Sometimes, Zeller referred to women's breasts as "titties."

18. Once, Zeller told Slygh not to flush tampons down the toilet. This was apparently a result of a concern about the plumbing or septic system.

19. Zeller once told Slygh that both men and women needed testosterone in order to maintain their sex drive.

20. Zeller told Slygh a number of off color jokes, although she could not remember any of them.

21. Zeller disclosed to Slygh that he had an intimate relationship with a prior secretary.

22. Zeller told Slygh, perhaps in jest, that he was going to put golden arches, standing for "Over 2,000 Served," over his bed.

23. There is no evidence that Zeller ever threatened Slygh in any way. Nor did he ask her out on a date or to have sex with him. There is no evidence that he touched her in any place that might be considered inappropriate.

24. Zeller's conduct was sufficiently severe and pervasive to alter Slygh's working conditions. It is important to note that Slygh and Zeller worked in a house, with nobody else present, subject to visitors rarely and only by appointment and that the house was located in a rural, sparsely populated area.

25. Slygh resigned her position with the Company effective August 12, 1994. When she left, Slygh had accepted another position at Deig Brothers Construction (Deig Brothers). Slygh began work at that position on August 16, 1994.

26. Because Zeller had told her that he had had an intimate relationship with a prior secretary, it was not unreasonable for Slygh to fear that Zeller might have had the same thing in mind for her, especially given his frequently expressed interest in her and sexuality. Consequently, a reasonable person in Slygh's position would have felt, as Slygh did, compelled to resign.

27. Zeller's conduct was, from the objective perspective of a reasonable person, sufficiently pervasive to alter Slygh's working conditions.

28. Slygh subjectively considered the behavior of Zeller to be unwelcome conduct of a sexual nature that was sufficiently severe and pervasive to alter her working conditions. Despite large sums of debt arising from medical bills that pertained to the premature birth and care of Slygh's youngest child, Slygh still chose to take another job that paid less than she was paid by the Company.

Appellant's Appendix, Tab 4 at 5–7.

The ICRC's order provides as follows with respect to Perry:

39. During the 2 1/2 months that Perry worked for the Company, Zeller engaged in some behavior that was, or is claimed to have been, of a sexual nature. Those incidences, and Perry's responses (if any), are discussed in detail below.

40. Twice during Perry's first day at work, Zeller reached across her to answer the phone, brushing the upper portion of her body while she was seated. This disturbed Perry because there was another phone

the other direction. Perry, who acknowledges that the other phone was "sometimes" connected to a FAX machine, responded by backing away from the desk to eliminate bodily contact.

41. On one occasion, Zeller stood, eyeing Perry up and down, moving his head back and forth, and moaning.

42. Zeller called Perry into the laundry area, asked her to look at his folded laundry (with his boxer shorts on top), and tell him whether he had done it right.

43. On more than one occasion, Zeller would be semi-clad (lacking a shirt and maybe socks) and complete dressing in Perry's presence. Perry would just look the other way.

44. Zeller repeatedly complimented Perry on her hair.

45. After hearing a discussion on a "Paul Harvey" radio piece concerning homosexuality, Zeller told Perry that he could see 2 women together but not 2 men.

46. Zeller told Perry that it was fortunate that a certain man had not seen her because he (Zeller) would never get rid of that man, who would be camped out on the door.

47. At one point, Perry and Zeller were discussing Jack Rodgers (Rodgers). Zeller told Perry that Rodgers surely could not satisfy his (Rodgers') wife because she had once taken on the whole football team.

48. Zeller told Perry that he would not have sex with his ex-wife if she smelled like tobacco smoke unless she took a shower first.

49. Zeller told Perry about an incident during a vacation with an ex-girlfriend in which the two had awakened in a canoe and had sexual relations. She had hurt her back and this ruined the rest of the vacation for Zeller. Perry infers that Zeller thought that the vacation was ruined because she couldn't have sex any more. This inference is possibly accurate but it also seems possible that the ex-girlfriend's injury prevented her from canoeing and that that limitation contributed to Zeller's view that the vacation was ruined.

50. After a while, at lunch, Zeller would turn off the basement lights and insist that Perry eat lunch upstairs, with him.

51. At one point, Perry noticed that Zeller had begun to purchase items for his lunch of the same type that she usually brought.

52. A number of times, Perry told Zeller that he was embarrassing her and asked that he quit bringing up these kinds of things. If those requests had any effect, they were less than fully successful.

53. The incident that, to Perry, was the last straw was one day when Zeller called her to his bedroom to see something on TV. Although Zeller was fully clothed, Perry was quite disturbed.

54. There is no evidence that Zeller ever threatened Perry in any way. Nor did he ask her out on a date or to have sex with him. There is no evidence that he touched her in any place that might be considered inappropriate.

55. Zeller's conduct was sufficiently severe and pervasive to alter Perry's working conditions. It is important to note that Perry and Zeller worked in a house, with nobody else present, subject to visitors

rarely and only by appointment and that the house was located in a rural, sparsely populated area.

56. Perry resigned her position with the Company effective November 23, 1994. When she left, Perry had no other employment arranged.

57. Because Zeller had told her that he had had an intimate relationship with a prior secretary, it was not unreasonable for Perry to fear that Zeller might have had the same thing in mind for her, especially given his frequently expressed interest in her and sexuality. Consequently, a reasonable person in Perry's position would have felt, as Perry did, compelled to resign.

58. Zeller's conduct was, from the objective perspective of a reasonable person, sufficiently pervasive to alter Perry's working conditions.

59. Perry subjectively considered the behavior of Zeller to be unwelcome conduct of a sexual nature that was sufficiently severe and pervasive to alter her working conditions. Despite the lack of other employment, Perry still felt that her only reasonable course was to remove herself from the environment by resigning.

*Id.* at 8–10. The Company appeals the ICRC's determination that Zeller sexually harassed Slygh and Perry.

## I.

■ The first issue is whether the ICRC's order remanding to the ALJ with instructions to find that Slygh and Perry were unlawfully sexually harassed was contrary to the requirements of the Indiana Administrative Orders and Procedures Act, Ind.Code §§ 4–21.5–1–1 through 4–21.5–7–9 ("AOPA"). The Company contends that the ICRC's remand order is governed by the AOPA. Thus, according to the Company, we must determine whether the ICRC's remand order was arbitrary, capricious, or not in accordance with law pursuant to Ind.Code § 4–21.5–5–14 (1998). The Company argues that the ICRC's remand order "failed to cite any evidence to support its decision" and was, thus, arbitrary and capricious. Appellant's Brief at 14. Slygh and Perry argue that the ICRC's remand order complied with the AOPA because "the law did not require the ICRC to supplement its remand order with findings of fact or anything else to make it valid."[1] Appellee's Brief at 11.

The AOPA provides that:

After an administrative law judge issues an order under section 27 of this chapter, the ultimate authority or its designee shall issue a final order:

(1) affirming;

(2) modifying; or

(3) dissolving;

the administrative law judge's order. The ultimate authority or its designee may remand the matter, *with or without instructions*, to an administrative law judge for further proceedings.

1. Slygh and Perry also argue that, while the AOPA applies generally to administrative adjudications of the ICRC, it does not apply to the extent that a statute clearly and specifically provides otherwise. Appellee's Brief at 10 (citing Ind.Code § 4–21.5–2–3 (1998)). Slygh and Perry contend that as a result of Ind.Code § 22–9–1–18(d) (1998), which provides for an appeal "to the court of appeals under the same terms, conditions, and standards that govern appeals in ordinary civil actions" after the ICRC's final appealable order, "the judicial review sections and standards of the AOPA don't apply to the remand order at issue." Appellee's Brief at 10. We need not address this argument because we conclude that even if the AOPA is applicable, the ICRC's remand order complied with the AOPA.

I.C. § 4–21.5–3–29(b) (1998) (emphasis added). Thus, under the AOPA, a remand order, "with or without instructions," complies with the statute. Further, Ind.Code § 4–21.5–3–28(g) (1998) provides that:

The *final order* of the ultimate authority or its designee must:

(1) identify any differences between the final order and the nonfinal order issued by the administrative law judge under section 27 of this chapter;

(2) *include findings of fact* meeting the standards of section 27 of this chapter or incorporate the findings of fact in the administrative law judge's order by express reference to the order; and

(3) briefly explain the available procedures and time limit for seeking administrative review of the final order by another agency under section 30 of this chapter (if any is available).

Thus, the ICRC's "final order" must contain findings of fact. However, contrary to the Company's assertion, nothing in the AOPA requires the ICRC to issue findings of fact or cite "substantial evidence" in support of its remand order. Appellant's Brief at 14.

## II.

The next issue is whether inferences made by the ICRC in its findings were reasonable. As an initial matter, the parties disagree as to the appropriate standard of review. The Company argues that review of the ICRC's order is governed by the AOPA. Slygh and Perry argue that the appropriate standard of review is "that which is applicable to orders from other entities of state government that, like those of the ICRC, are subject to direct review by the Court of Appeals." Appellee's Brief at 19; *see* Ind.Code §§ 22–9–1–18 (1998) & 22–9–8–1 (1998). However, as the Company points out in its reply brief, regardless of whether the AOPA is applicable, the ultimate standard of review proposed by the parties is identical.

In reviewing an administrative decision, we must determine "whether substantial evidence, together with any reasonable inferences that flow from such evidence, support the [agency's] findings and conclusions." *Walker v. Muscatatuck State Dev. Ctr.*, 694 N.E.2d 258, 266 (Ind. 1998). In doing so, we do not reweigh the evidence or judge the credibility of witnesses, and we consider only the evidence most favorable to the ICRC's findings. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1317 (Ind.1998), *reh'g denied*. However, if the question before us is primarily a legal question, "we do not grant the same degree of deference to the [agency's] decision, for law is the province of the judiciary and our constitutional system empowers the courts to draw legal conclusions." *Walker*, 694 N.E.2d at 266. Thus, we review conclusions of law to determine whether the ICRC correctly interpreted and applied the law. *M & J Mgmt., Inc. v. Review Bd. of Dep't of Workforce Dev.*, 711 N.E.2d 58, 61 (Ind.Ct.App.1999).

Where the "conclusions as to ultimate facts involve an inference or deduction based on the findings of basic fact, ... these questions of ultimate fact are sometimes described as 'questions of law.'" *McClain*, 693 N.E.2d at 1317. In discussing the Unemployment Insurance Review Board, our supreme court held that these "questions of law" are:

more appropriately characterized as mixed questions of law and fact. As such, they are typically reviewed to ensure that the Board's inference is "reasonable" or "reasonable in light of [the Board's] findings." The term "reasonableness" is conveniently imprecise. Some questions of ultimate fact are within the special competence of the Board. If so, it is appropriate for a

court to exercise greater deference to the "reasonableness" of the Board's conclusion.... In evaluating this conclusion, if no proposition of law is contravened or ignored by the agency conclusions, the "reasonable" inference standard gives deference to the agency determination. However, not all ultimate facts are within the Board's area of expertise. As to these, the reviewing court is more likely to exercise its own judgment. In either case the court examines the logic of the inference drawn and imposes any rules of law that may drive the result. That inference still requires reversal if the underlying facts are not supported by substantial evidence or the logic of the inference is faulty, even where the agency acts within its expertise, or if the agency proceeds under an incorrect view of the law.

*Id.* at 1317 (internal citations and footnotes omitted). In summary,

basic facts are reviewed for substantial evidence, legal propositions are reviewed for their correctness. The best that can be said for ultimate facts or "mixed questions" as a general proposition is that the reviewing court must determine whether the Board's finding of ultimate fact is a reasonable one. The amount of deference given to the Board turns on whether the issue is one within the expertise of the Board.

*Id.*

■ In determining that Slygh and Perry were subjected to sexual harassment, the ICRC entered numerous findings of fact and conclusions thereon.[2] The Company challenges inferences made by the ICRC in several of the "ultimate facts." As noted above, we must determine whether the ICRC's inferences are "reasonable." *Id.*

A. *Finding No. 26*

■ The ICRC's Finding No. 26 provides that:

Because Zeller had told her that he had had an intimate relationship with a prior secretary, it was not unreasonable for Slygh to fear that Zeller might have had the same thing in mind for her, especially given his frequently expressed interest in her and sexuality. Consequently, a reasonable person in Slygh's position would have felt, as Slygh did, compelled to resign.

Appellant's Appendix, Tab 4 at 6–7. The Company argues that the ICRC's inference that a reasonable person in Slygh's position would have felt compelled to resign because she knew of his relationship with a prior secretary is unreasonable. The Company points out that Slygh had never met the prior secretary and the relationship between Zeller and the prior secretary was consensual. However, we note that the point is not whether Zeller had a relationship with a prior secretary or whether Slygh knew the prior secretary but rather that Zeller told Slygh of it,

---

**2.** The Company also challenges the ALJ's revision of several of its proposed findings of fact and conclusions thereon because of the ICRC's remand order. Under Ind.Code § 22–9–8–1 (1998) "[e]ither party to a dispute filed under IC 22–9 may, not more than thirty (30) days after the date of receipt of the *commission's final appealable order,* appeal to the court of appeals under the same terms, conditions, and standards that govern appeals in ordinary civil actions." (emphasis added). Consequently, a party may appeal only the ICRC's final appealable order. Thus, we must review the ICRC's final order without regard to changes made to the ALJ's proposed order as a result of the ICRC's remand order. The issue is simply whether the findings in the ICRC's final order are supported by substantial evidence and ICRC correctly interpreted and applied the law.

thereby conveying willingness if not a desire to have a similar relationship with her.

Further, Slygh and Perry argue that the Company misconstrues the ICRC's finding. Specifically, Slygh and Perry argue that the ICRC's inference that a reasonable person in Slygh's position would have felt compelled to resign is not based solely upon Slygh's knowledge of Zeller's relationship with his previous secretary. Rather, Slygh and Perry argue that the ICRC's inference is based upon the totality of the circumstances. We agree. The ICRC found that a reasonable person in "Slygh's position" would have felt compelled to resign. *Id.* at 7. The ICRC's inference was not based solely upon Slygh's knowledge of Zeller's previous relationship. Rather, the inference was based upon that knowledge along with Zeller's actions towards Slygh, which included appearing before her semi-clad and dressing in her presence, telling her that his bathtub was big enough for two, folding his underwear in her presence, telling her that he had an annual HIV test, showing her a picture of himself and an ex-girlfriend skinny dipping, telling off-color jokes, telling her that he was going to put golden arches standing for "over 2,000 served" over his bed, and inviting her to his bedroom to watch television. *Id.* at 6. Based upon the totality of the circumstances, we cannot say that the ICRC's inference that a reasonable person in Slygh's position would have felt compelled to resign was unreasonable.

### B. *Finding No. 57*

 The ICRC's Finding No. 57 provides that:

> Because Zeller had told her that he had had an intimate relationship with a prior secretary, it was not unreasonable for Perry to fear that Zeller might have had the same thing in mind for her, especially given his frequently expressed interest in her and sexuality. Consequently, a reasonable person in Perry's position would have felt, as Perry did, compelled to resign.

*Id.* at 10. The Company again argues that the ICRC's inference that a reasonable person in Perry's position would have felt compelled to resign because she knew of his relationship with a prior secretary is unreasonable. The Company points out, and Slygh and Perry concede, that no evidence was presented that Zeller informed Perry that he had an intimate relationship with a prior secretary. Thus, that portion of the finding is not based upon substantial evidence and is erroneous. However, as above, the ICRC's inference was based upon the totality of the circumstances, not simply Perry's "knowledge" of Zeller's relationship with his previous secretary.

The totality of the circumstances that the ICRC considered included Zeller brushing the upper portion of Perry's body on her first day of work, eyeing her up and down and moaning, asking her to inspect his folded boxer shorts, telling her that he could see two women together but not two men, telling her about his sexual relations with an ex-girlfriend in a boat, telling her about his sexual relationship with his ex-wife, forcing her to eat lunch upstairs with him, dressing in her presence, and calling her to his bedroom to watch television. All of these events occurred during a two and one-half month period of time. Even excluding from consideration the ICRC's finding that Perry had knowledge of Zeller's relationship with his prior secretary, we cannot say that the ICRC's inference that a reasonable person in Perry's position would have felt compelled to resign is unreasonable.

### C. *Finding No. 24 and Finding No. 55*

 The ICRC's Finding No. 24 provides that:

Zeller's conduct was sufficiently severe and pervasive to alter Slygh's working conditions. It is important to note that Slygh and Zeller worked in a house, with nobody else present, subject to visitors rarely and only by appointment and that the house was located in a rural, sparsely populated area.

*Id.* at 6. The ICRC's Finding No. 55 provides that:

Zeller's conduct was sufficiently severe and pervasive to alter Perry's working conditions. It is important to note that Perry and Zeller worked in a house, with nobody else present, subject to visitors rarely and only by appointment and that the house was located in a rural, sparsely populated area.

*Id.* at 10.

The Company argues that the inference that Zeller's conduct was sufficiently severe and pervasive to alter Slygh's and Perry's working conditions based upon evidence that Slygh and Perry worked in a rural setting with infrequent visitors is unreasonable. The Company further argues that no credible evidence was presented to suggest that the rural location of the Company had any influence on Slygh's or Perry's working conditions.

The ICRC found that Zeller's conduct was sufficiently severe and pervasive to alter Slygh's and Perry's working conditions. The isolated location of the Company's office and the fact that Slygh and Perry were often alone with Zeller were simply factors in the ICRC's decision. In isolation, the fact that the Company's office was in a rural setting and infrequently had visitors is not enough to support a finding that Zeller's conduct altered Perry's and Slygh's working conditions. However, based upon the totality of the circumstances discussed above, we cannot say that the ICRC's inference that Zeller's conduct was sufficiently severe and perva-

sive to alter Slygh's and Perry's working conditions was unreasonable.

### D. *Finding No. 28*

The ICRC's Finding No. 28 provides that:

Slygh subjectively considered the behavior of Zeller to be unwelcome conduct of a sexual nature that was sufficiently severe and pervasive to alter her working conditions. Despite large sums of debt arising from medical bills that pertained to the premature birth and care of Slygh's youngest child, Slygh still chose to take another job that paid less than she was paid by the Company.

*Id.* at 7.

The Company argues that the ICRC's inference that Slygh subjectively considered Zeller's behavior to be sufficiently severe and pervasive to alter her working conditions is not supported by substantial evidence and is unreasonable. First, the Company contends that the evidence demonstrated that Slygh did not leave her employment with the Company because of sexual harassment. Slygh wrote in a resignation letter that her new job with a large construction company would allow her to work part-time and spend more time with her children. The Company also contends that Slygh's health insurance covered most of the hospital bills from the birth of her son.

The Company also argues that Slygh did not subjectively consider Zeller's behavior to be severe and pervasive. Specifically, the Company points to testimony that Slygh arranged a date between Zeller and her friend and told her friend that Zeller was a perfect gentleman and would be good for sex because he had a negative HIV test result. Further, according to the Company, Slygh modeled a swimsuit for Zeller and her friend, recommended the

Company as a great place to work, called her friend while lying on Zeller's bed, told Zeller about her friends' sexual experiences, and allowed Zeller to repair the air conditioner in her home.

The Company simply requests that we reweigh the evidence and judge Slygh's credibility, which we cannot do. *McClain*, 693 N.E.2d at 1317. Rather, we must consider only the evidence most favorable to the ICRC's findings. *Id.* Slygh points to evidence in the record that she left her employment with the Company because Zeller's actions made her uncomfortable and she "couldn't take it anymore." Transcript at 141. Slygh testified that her employment with the Company was "taking a toll" on her "emotional well-being." *Id.* Slygh also testified that she did not mention the sexual harassment in the resignation letter because she was afraid that Zeller would jeopardize her future employment. Further, Slygh testified that she earned less money at her new employment with the construction company than she earned while working at the Company. She took the position earning less money despite substantial medical bills resulting from the premature birth of her son. Although she had health insurance, the insurance covered only eighty percent of the approximately $120,000 hospital bill. Under the totality of the circumstances, we cannot say that the ICRC's finding that Slygh subjectively considered Zeller's behavior to be sufficiently severe and pervasive to alter her working conditions is unreasonable.

E. *Finding No. 59*

■ The ICRC's Finding No. 59 provides that:

Perry subjectively considered the behavior of Zeller to be unwelcome conduct of a sexual nature that was sufficiently severe and pervasive to alter her working

conditions. Despite the lack of other employment, Perry still felt that her only reasonable course was to remove herself from the environment by resigning.

Appellant's Appendix, Tab 4 at 10. The Company argues that the ICRC's inference that Perry subjectively considered Zeller's behavior to be sufficiently severe and pervasive to alter her working conditions is unreasonable. According to the Company, Perry testified that she left the Company because she was not receiving sufficient training from Zeller. Thus, the Company argues that Perry left her employment because of dissatisfaction with the job, not sexual harassment.

As above, the Company simply requests that we reweigh the evidence and judge Perry's credibility, which we cannot do. *McClain*, 693 N.E.2d at 1317. Rather, we must consider only the evidence most favorable to the ICRC's findings. *Id.* Perry testified that her husband had been laid off work and that she needed a job to supplement their income. However, after Zeller called her into his bedroom to watch television, she was "afraid of him" and decided that she could not "do this anymore because ... [she] didn't know what [he was] going to do." Transcript at 222. The next day, Perry confronted Zeller and told him that she was "uncomfortable" and did not like "the comments" and the "gestures." *Id.* at 228. Perry left her employment with the Company despite the fact that she did not have another job. Under the totality of the circumstances, we cannot say that the ICRC's finding that Perry subjectively considered Zeller's behavior to be sufficiently severe and pervasive to alter her working conditions is unreasonable.

### III.

■ The next issue is whether the ICRC's conclusion that Slygh and Perry

suffered actionable sexual harassment is erroneous. As noted above, we review conclusions of law to determine whether the ICRC correctly interpreted and applied the law. *M & J Mgmt.*, 711 N.E.2d at 61. The Company argues that even if we accept the ICRC's order "at face value, Slygh['s] and Perry's allegations do not rise to the level of actionable sexual harassment." Appellant's Brief at 28. Slygh and Perry contend that, in considering the totality of the circumstances, the ICRC correctly determined that Zeller's sexual harassment was sufficiently pervasive as to alter their working conditions.

The Indiana Civil Rights Law provides that "[e]very discriminatory practice relating to ... employment ... shall be considered unlawful unless it is specifically exempted by this chapter." Ind.Code § 22–9–1–3(*l*) (1998). A "discriminatory practice" is "the exclusion of a person from equal opportunities because of race, religion, color, sex, disability, national origin, or ancestry." *Id.* Our supreme court has held that "[i]n construing Indiana's Civil Rights Law, we look to federal case law for guidance." *Ind. Civil Rights Comm'n v. Alder*, 714 N.E.2d 632, 636 (Ind.1999). Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). The United States Supreme Court has held "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405.

Sexual harassment is actionable under Title VII only if it is so "severe or pervasive" as to alter the conditions of the victim's employment and create an abusive working environment. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 1509, 149 L.Ed.2d 509 (2001), *reh'g denied.* Conduct that "is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22, 114 S.Ct. at 370.

Whether an environment is "hostile" or "abusive" can be determined only by looking at the totality of the circumstances. *Id.* at 23, 114 S.Ct. at 371.

> These [circumstances] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* The Supreme Court has emphasized that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275,

2283, 141 L.Ed.2d 662 (1998) (internal citations omitted). As the Seventh Circuit noted: "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir.2003).

■■■■■ The Company argues that Zeller's conduct was not sufficiently severe or pervasive to alter Slygh's or Perry's work environments.[3] The Company compares this situation to *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1995). In *Baskerville*, the complainant's supervisor, Hall, made a handful of comments to her during a seven-month period. *Id.* at 430. The comments included the following: (1) he would call her "pretty girl;" (2) he once made a grunting sound that sounded like "um um um" as she left his office; (3) when she commented on how hot his office was, he said, "Not until you stepped your foot in here;" (4) once when the announcement, "May I have your attention, please," was broadcast, he stopped at her desk and said, "You know what that means, don't you? All pretty girls run around naked;" (5) he once called her a "tilly;" (6) he once told her that his wife had told him he had "better clean up my act" and "better think of you as Ms. Anita Hill;" (7) when asked why he had left the office Christmas Party early, he replied that there were so many pretty girls there that he "didn't want to lose control, so [he] thought [he]'d better leave;" (8) when she complained that his office was "smokey" from cigarette smoke, he replied, "Oh really? Were we dancing, like in a nightclub?;" and (9) he once said that it was lonely in his hotel room and made a gesture intended to suggest masturbation. *Id.*

The complainant brought an action under Title VII for sexual harassment, and a jury awarded her damages. *Id.* On appeal, the Seventh Circuit reversed, holding that:

> He never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a date with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said

---

**3.** In *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the United States Supreme Court held that:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 807, 118 S.Ct. at 2292–2293; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). However, the *Faragher* test is inapplicable here because Zeller was the Company's sole proprietor. An employer is liable for unlawful harassment whenever the harasser is of a sufficiently high rank to fall "within that class of an employer organization's officials who may be treated as the organization's proxy." *Faragher*, 524 U.S. at 789, 118 S.Ct. at 2284. In such circumstances, the official's unlawful harassment is imputed automatically to the employer. *Id.* Thus, the employer cannot raise the affirmative defense, even if the harassment did not result in a tangible employment action. Because Zeller is within the class of persons who may be treated as the organization's proxy, the *Faragher* affirmative defense is not in issue.

anything to her that could not be repeated on primetime television. The comment about Anita Hill was the opposite of solicitation, the implication being that he would get into trouble if he didn't keep his distance. The use of the word "tilly" (an Irish word for something added for good measure, and a World War II British slang term for a truck) to refer to a woman is apparently an innovation of Hall's, and its point remains entirely obscure. Some of his repartée, such as, "Not until you stepped your foot in here," or, "Were we dancing, like in a nightclub?," has the sexual charge of an Abbott and Costello movie. The reference to masturbation completes the impression of a man whose sense of humor took final shape in adolescence. It is no doubt distasteful to a sensitive woman to have such a silly man as one's boss, but only a woman of Victorian delicacy—a woman mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity—would find Hall's patter substantially more distressing than the heat and cigarette smoke of which the plaintiff does not complain. The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.

*Id.* at 431. However, the Seventh Circuit noted the following:

> We are mindful of the dangers that lurk in trying to assess the impact of words without taking account of gesture, inflection, the physical propinquity of speaker and hearer, the presence or absence of other persons, and other aspects of context. Remarks innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive

isolation of a hotel room. So too remarks accompanied by threatening gestures or contorted facial features, or delivered from so short a distance from the listener's face as to invade the listener's private space. Even a gross disparity in size between speaker and listener, favoring the former, might ominously magnify the impact of the speaker's words.

> It is a little difficult to imagine a context that would render Hall's sallies threatening or otherwise deeply disturbing. But we need not test the breadth of our imagination. Hall and Baskerville were never alone outside the office, and there is no suggestion of any other contextual feature of their conversations that might make Hall a harasser. We conclude that no reasonable jury could find that Hall's remarks created a hostile working environment.

*Id.* (internal citation omitted).

Here, Slygh was employed by the Company as a secretary from early 1993 through August 12, 1994. The Company's office was located in a rural location in the basement of Zeller's home. During her employment, Slygh was almost always either alone or with Zeller. The ICRC found that Zeller repeatedly told Slygh about his sexual experiences. For example, Zeller told Slygh that he had an intimate relationship with a prior secretary. Zeller told Slygh that he was going to put golden arches, standing for "Over 2,000 Served," over his bed. Zeller showed Slygh pictures of himself and a prior girlfriend skinny-dipping that showed the naked buttocks of both. Appellant's Appendix Tab 4 at 6.

Zeller also appeared repeatedly in front of Slygh semi-clad (lacking a shirt and maybe socks) and completed dressing in her presence. He folded his laundry, including his underwear in her presence.

Zeller made a comment to Slygh about some article of her clothing from which he would like to cut the strings. From time to time, Zeller would call Slygh to his bedroom to see something on the television. Zeller also told Slygh that his bathtub was big enough for two.

One morning, Zeller told her that if she had arrived a few seconds earlier, she would have caught him in his birthday suit. Zeller told Slygh that he had an annual HIV test and that he thought that everybody should. Sometimes, he referred to women's breasts as "titties." Zeller told Slygh not to flush tampons down the toilet. Zeller once told her that both men and women needed testosterone in order to maintain their sex drive. Zeller told Slygh a number of off color jokes.

Slygh testified that Zeller did not make comments to her on a daily basis because he was not there on a daily basis. However, Zeller made suggestive comments to her on a "fairly regular" basis. Transcript at 137. Slygh eventually left her employment with the Company because Zeller's actions made her uncomfortable, and she "couldn't take it anymore." Transcript at 141. Slygh testified that her employment with the Company was "taking a toll" on her "emotional well-being." *Id.* Despite extensive medical bills from the premature birth of her son, Slygh took another job earning less money.

Perry was employed by the Company as a secretary from September 7, 1994 through November 23, 1994. During her employment, the Company's office was still located in a rural location in the basement of Zeller's home. As with Slygh, Perry was almost always either alone or with Zeller. During the two and one-half months that Perry worked for the Company, Zeller repeatedly made sexually suggestive comments to her and told her about his past sexual experiences. For example, twice during Perry's first day at work, Zeller reached across her to answer the phone, despite the fact that there was another phone the other direction, and brushed the upper portion of her body. On one occasion, Zeller stood, eyeing Perry up and down, moving his head back and forth, and moaning. Zeller also repeatedly complimented Perry on her hair.

Zeller called Perry into the laundry area, asked her to look at his folded laundry, with his boxer shorts on top, and asked her whether he had done it right. Zeller often appeared semi-clad in front of Perry and completed dressing in her presence. Zeller told Perry that it was fortunate that a certain man had not seen her because the man would be camped out on the door and Zeller would never get rid him. Zeller would turn off the basement lights at lunch time and insist that Perry eat lunch upstairs with him. Zeller began to purchase items for his lunch of the same type that Perry usually brought. Although Perry told Zeller that he was embarrassing her and asked that he quit bringing up these kinds of things, he failed to do so. The incident that, to Perry, was the last straw was when Zeller called her to his bedroom to see something on the television. Although Zeller was fully clothed, Perry was quite disturbed by the incident.

Zeller once told Perry that a certain man could not satisfy his wife because she had once taken on the whole football team. He said that he would not have sex with his ex-wife if she smelled like tobacco smoke unless she took a shower first. He also told Perry about a sexual encounter with an ex-girlfriend in a boat. After hearing a discussion on the radio regarding homosexuality, Zeller told Perry that he could see two women together but not two men.

After the bedroom incident, Perry was "afraid" of Zeller and decided that she could not "do this anymore because ... [she] didn't know what [he was] going to do." Transcript at 222. The next day, Perry confronted Zeller and told him that she was "uncomfortable" and did not like "the comments" and the "gestures." *Id.* at 228. Perry testified that even though her husband had been laid off work and she needed a job to supplement their income, she left her employment with the Company without another job arranged.

We conclude that *Baskerville* is distinguishable from these situations. While, as in *Baskerville*, Zeller did not threaten either woman, ask them directly for sex, or touch them (except for brushing against Perry's upper body), Zeller's actions and comments occurred here with much greater frequency than in *Baskerville*. In *Baskerville*, the harasser made only nine comments (one of which may have been repeated) over a seven-month period. Here, while Slygh could not say that Zeller's comments to her occurred on a daily basis because Zeller was not in the office each day, she testified that his comments to her occurred on a fairly regular basis. Further, Zeller made numerous comments to Perry during the short time that she worked for the Company. The Seventh Circuit in *Baskerville* also noted that the presence or absence of other persons was a factor to consider. Here, Slygh and Perry worked in a rural, isolated area in the basement of Zeller's home. The office rarely had visitors, and they often worked with only Zeller. Further, Zeller's comments and actions were more severe than in *Baskerville*. While the harasser in *Baskerville* never invited the complainant, directly or indirectly, to have sex with him, Zeller's conduct could be viewed as an implicit invitation for a sexual relationship. In fact, it is difficult to see Zeller's conduct as anything other than trolling, looking for

another sexual relationship with his secretary.

We find this case more similar to that of *Stephenson v. Aluminum Co. of America,* 915 F.Supp. 39 (S.D.Ind.1995). In *Stephenson,* the plaintiff presented evidence that while working at Aluminum Company of America she was subjected to sexually explicit magazines and cartoons, a letter derogatory of women was left on a clipboard by a coworker, a coworker made sexual remarks and unwelcome advances to her, and she was stalked around the plant site by another coworker. *Id.* at 50. In addition, the plaintiff was subjected on a nearly daily basis to the comments and attitude of Ken White, whose shift regularly preceded hers. *Id.* White was often rude and hostile to the plaintiff and other women, told the plaintiff that women who worked in industrial settings were "sluts and whores," and frequently complained about having to work with women. *Id.* at 43–44. After the plaintiff complained about the behavior, she was transferred to a different job and eventually fired. *Id.* at 46–48.

The defendant company argued that the plaintiff experienced "instances of inappropriate behavior" and that the relatively isolated instances of misconduct would not support a hostile environment claim. *Id.* at 50. The district court held that "[t]he determination of the existence of a hostile environment must be made by evaluating all the circumstances." *Id.* Further, the district court found that the "pervasive nature of the incidents and especially the recurring discrimination by [White] were sufficiently severe that a reasonable person would have found the work environment hostile and abusive." *Id.*

Similarly, here, Slygh and Perry were subjected to frequent sexual comments and actions by Zeller. Moreover, these

comments and actions occurred in the context of a rural, isolated office where Slygh and Perry were alone with Zeller. Under the totality of the circumstances, a reasonable person would consider the conduct to which Slygh and Perry were subjected so severe or pervasive as to alter the conditions of their employment and create an abusive working environment. Further, the evidence demonstrated that Slygh and Perry subjectively perceived the environment to be abusive. Consequently, we cannot say that the ICRC's conclusion that both Slygh and Perry were the victims of unlawful sexual harassment is erroneous. *See, e.g., Cooke v. Stefani Mgmt. Serv., Inc.,* 250 F.3d 564, 567 (7th Cir.2001) (affirming a jury's verdict that bartender was sexually harassed by his supervisor).

For the foregoing reasons, we affirm the ICRC's judgment in favor of Slygh and Perry.

Affirmed.

BAKER, J., and BROOK, C.J., concur.